IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 2, 2002 Session

## UROLOGY ASSOCIATES, P.C.
### v.
## CIGNA HEALTHCARE OF TENNESSEE, INC.,
## f/k/a CIGNA HEALTHPLAN OF TENNESSEE, INC.

**An Appeal from the Chancery Court for Davidson County**
**No. 00-3386-III    Ellen Hobbs Lyle, Chancellor**

---

**No. M2001-02252-COA-R3-CV - Filed October 11, 2002**

---

This case involves the interpretation of an arbitration agreement. The plaintiff physicians' group provided medical services to individuals who were insured by the defendant insurance company. Disputes arose regarding the insurance company's payment to the physicians' group for those medical services. Consequently, the physicians' group filed this lawsuit against the insurance company. Pursuant to the parties' contract, the insurance company moved to dismiss or to stay the proceedings and to compel arbitration. The contract contained a dispute resolution provision which stated, in part, that disputes arising between the parties "shall be submitted either to a dispute resolution entity, or to a single arbitrator selected by the American Arbitration Association, as the parties shall agree." The trial court denied the insurance company's motion to compel arbitration, determining that the dispute resolution provision "neither explicitly nor clearly" required the parties to arbitrate, and that the provision was "too vague, imprecise and impractical" to be enforced. The insurance company now appeals. We reverse, concluding that the provision at issue requires the parties to submit their disputes to a third party for binding resolution and, thus, constitutes a valid, enforceable agreement to arbitrate.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed and Remanded**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Gary C. Shockley and Brigid M. Carpenter, Nashville, Tennessee; Brian Boyle and Matthew L. Olmstead, Washington, D.C., for the appellant, CIGNA HealthCare of Tennessee, Inc., f/k/a CIGNA Healthplan of Tennessee, Inc.

Steven A. Riley, Amy J. Everhart, and Amy C. Kurzweg, Nashville Tennessee, for the appellee, Urology Associates, P.C.

**OPINION**

Plaintiff/Appellee Urology Associates, Inc. ("Urology Associates"), is a group of physicians who practice in Tennessee. Defendant/Appellant CIGNA HealthCare of Tennessee, Inc., f/k/a CIGNA Healthplan of Tennessee ("CIGNA"), is a Tennessee corporation that insures or administers health benefits for employers who sponsor medical benefit plans for their employees. This service is provided through CIGNA's health maintenance organization ("HMO") products, preferred provider organization ("PPO") products, and other types of health care delivery products. CIGNA is also an indirect affiliate of a number of CIGNA HealthCare companies throughout the United States that provide similar insurance products.[1]

In July 1993, Urology Associates entered into a Physician Managed Care Agreement ("the Agreement") with CIGNA.[2] Under the Agreement, Urology Associates is a "participating provider."[3] As a participating provider, Urology Associates agreed to provide health care services to participants of the HMO, PPO, and Referral Plan PPO programs of CIGNA and its CIGNA HealthCare affiliates.[4] In return, CIGNA agreed to pay Urology Associates for services rendered as set out in the Agreement. The Agreement also referred to three separate sets of "Program Requirements," one for each program in which Urology Associates agreed to participate – HMO, PPO, and Referral Plan PPO.[5] The "Program Requirements" are the rules and procedures that participating providers must follow in order to obtain reimbursement pursuant to each program. Each set of Program Requirements includes a description of the "utilization management" process,

---

[1] Participants in these employer-sponsored plans include residents of Kentucky who are treated in Tennessee by Urology Associates.

[2] The original Agreement provided for payment to Urology Associates based on a fee-for-service arrangement, whereby CIGNA's payment was based on the services performed. Soon after the original agreement was signed, however, the parties entered into an amendment to the Agreement that changed the form of compensation to a per-member arrangement, whereby CIGNA would pay Urology Associates a certain amount per month for each member enrolled in the CIGNA health plan.

[3] "Participating Provider" is defined in the Agreement as "a hospital, a physician or any other health care practitioner or entity that has a direct or indirect contractual arrangement with CIGNA to provide Covered Services."

[4] "Covered Services" are "those health care services provided to a Participant in accordance with a Service Agreement." "Participant" is defined as "any individual, or eligible dependent of such individual, . . . who is eligible for Covered Services pursuant to a Service Agreement." A "Service Agreement" is defined as "those agreements among CIGNA *or a CIGNA Affiliate*, and an employer, insurer, labor union, trust or other organization or entity, or an individual, that specifies services to be provided to or for the benefit of, or arranged for or reimbursed to or for the benefit of Participants . . . ." (Emphasis added). Thus, under the Agreement at issue in this case, Urology Associates has agreed not only to treat participants in PPO or HMO programs administered by CIGNA, but also to treat participants in PPO or HMO programs administered by any of CIGNA's affiliated CIGNA HealthCare companies throughout the United States.

[5] The parties dispute whether these Program Requirements are a part of the Agreement and, therefore, whether the provisions therein are binding on the parties.

defined in the Agreement as "the process to review and determine whether certain health care services provided or to be provided to Participants are in accordance with Program Requirements." Generally, the utilization management process is a review process by which CIGNA ensures that it pays claims only when the participating provider has followed the Program Requirements.

The Agreement provided that, if the parties had a dispute arising out of the Agreement, "[t]he parties shall resolve [their] complaints or grievances . . . in accordance with the dispute resolution procedures described in the applicable Program Requirements." As of the date of the parties' original Agreement, the Program Requirements for the PPO and Referral Plan PPO programs contained the following provision regarding dispute resolution:

> ! CIGNA and Physician agree to meet and confer in good faith to resolve any problems or disputes that may arise under this [PPO or Referral Plan PPO] program.

> ! If Physician is not satisfied with such resolution and to the extent permitted by law, the matter in controversy shall be submitted either to a dispute resolution entity, or to a single arbitrator selected by the American Arbitration Association, as the parties shall agree within 60 days of the last attempted resolution. If the matter is submitted to arbitration, it shall be conducted in accordance with the commercial arbitration rules of the American Arbitration Association and shall be held in the jurisdiction of Physician's domicile. Both parties expressly covenant and agree to be bound by the decision of the dispute resolution entity or arbitrator as final determination of the matter in dispute. Each party shall assume its own costs, but shall share the cost of the resolution entity equally. Judgment upon the award rendered by the resolution entity may be entered in any court having jurisdiction. The parties agree that causes of action for medical malpractice shall not be submitted to arbitration.

The Program Requirements for the HMO program contained language identical to the second paragraph of the PPO and Referral Plan PPO Program Requirements. The first paragraph of the HMO Program Requirements, however, reads as follows:

> ! Disputes arising with respect to the performance or interpretation of the Agreement shall be submitted to the Medical Director for review and resolution. If Physician is not satisfied with the resolution, Physician may submit the matter to the National Medical Director, CIGNA Healthplan, Inc. The National Medical Director or his designee will review the matter and may seek written statements from the Medical Director, Physician and others as appropriate. The decision of the National Medical Director will be binding on Healthplan and Physician if the resolution is accepted by Physician.

Thus, all three sets of Program Requirements contained the second paragraph, providing that disputes "shall be submitted either to a dispute resolution entity, or to a single arbitrator. . . ," and stating that, "[i]f the matter is submitted to arbitration," the arbitration would be conducted according to American Arbitration Association rules. The paragraph stated further that the decision of the dispute resolution entity or the arbitrator would be "final," and that judgment on the arbitration award could be entered "in any court having jurisdiction."

The Program Requirements, dated October 1, 1991, remained in effect from the inception of the contract until they were amended in 1998 or 1999. On March 30, 1999, CIGNA representatives wrote a letter to Urology Associates announcing an amendment to the Agreement.[6] Enclosed with the letter were revised PPO and HMO Program Requirements dated July 1, 1998. Among other changes, the revised Program Requirements eliminated the dispute resolution provisions, but instead provided that "the matter in controversy shall be resolved according to the dispute resolution procedures set forth in the Agreement." As noted above, however, the Agreement did not include a substantive dispute resolution provision; rather, the Agreement stated that disputes would be resolved according to the procedures described in the applicable Program Requirements. Thus, each document referred to the other for dispute resolution procedures, and neither contained substantive dispute resolution procedures for the PPO and HMO programs. Consequently, the amendment to the Agreement had the effect of removing the arbitration requirement for those programs after the effective date of the amendment.

On October 30, 2000, Urology Associates filed a lawsuit against CIGNA, alleging that CIGNA breached the Agreement by failing to compensate Urology Associates properly for services provided to the individual insureds. In its complaint, Urology Associates included claims based on breach of contract, breach of the duty of good faith and fair dealing, negligence, and unjust enrichment. On December 4, 2000, CIGNA filed a motion to dismiss or, in the alternative, to stay the proceedings and compel arbitration pursuant to the second paragraph in the dispute resolution provisions quoted above. On July 6, 2001, CIGNA amended its motion, limiting its request to arbitrate only those claims for compensation for services provided before March 30, 1999. In its amended motion, CIGNA acknowledged that, "[d]ue to the change in the Program Requirements, claims arising before March 30, 1999 are subject to arbitration, while claims arising subsequent to that date are not." CIGNA then requested that the trial court bifurcate the proceedings, with one proceeding to consider claims arising before March 30, 1999, and a second proceeding to consider claims arising after March 30, 1999. CIGNA requested that the court compel arbitration only for the pre-March 30, 1999 claims.

On August 15, 2001, the trial court held a hearing on CIGNA's motion to compel arbitration. After the hearing, the trial court entered an order denying CIGNA's motion, concluding that the

---

[6]The Agreement provided that CIGNA "may amend [the] Agreement and Program Attachments by providing prior written notice to Physician. Failure of Physician to object in writing to any such proposed amendment within thirty (30) days following receipt of notice shall constitute Physician's acceptance thereof."

dispute resolution provisions in the original Program Requirements did not mandate arbitration. The trial court reasoned:

> Analysis of the . . . text [of the dispute resolution provision] reveals that arbitration is one of two alternatives the parties are required to agree to within sixty days. That conclusion is arrived at by reference to the first sentence of the provision which requires the parties to agree to resolution by a dispute resolution entity or arbitration, and the second sentence which contains the phrase, "if the matter is submitted to arbitration." Arbitration, then, was not agreed upon by the parties as the singular method for resolving disputes and in that sense arbitration is not required.

The trial court acknowledged that some portions of the dispute resolution provision indicated that the parties intended that some tribunal other than a court would resolve their disputes:

> The text of the provision, however, does indicate that disputes shall be resolved by a method other than a court proceeding. The support for this conclusion is the next to the last sentence, "Judgment upon the award rendered by the resolution entity may be entered in any court having jurisdiction." This sentence indicates that the resolution entity contemplated by the first sentence is something different from a court. There is also the sentence in the provision, "Both parties expressly covenant and agree to be bound by the decision of the dispute resolution entity or arbitrator as <u>final</u> determination of the matter in the dispute [emphasis added]." Final determination implies that a court proceeding is not an option. When these two sentences are considered, it appears, then, that the term contained in the first sentence, "dispute resolution entity," is something short of a court.

Nevertheless, the trial court found that the provision, as a whole, was "imprecise" and "somewhat impractical," in that it required the parties to agree on a dispute resolution person or entity. The trial court observed:

> The Court has also considered the imprecise, somewhat impractical aspect of the provision. The way the provision would work is the parties, having failed to agree to a resolution of their dispute, are required to agree on one of two methods to resolve the dispute – an arbitration or something else which appears not to be a court.

Under that reasoning, the trial court held:

> [T]he Court concludes, first, that the provision neither explicitly nor clearly requires the parties to submit this dispute to arbitration. The Court further concludes that the expression in the provision for something other than court resolution of the parties' disputes is too vague, imprecise and impractical to quali[f]y for federal and Tennessee case law requiring doubts to be resolved in favor of arbitration. To

compel arbitration would be to impose upon the parties a procedure for which they did not originally contract.

Thus, the trial court concluded that the provision did not clearly require arbitration; for this reason it denied CIGNA's motion to dismiss or to stay and compel arbitration. CIGNA now appeals that decision.[7]

CIGNA argues that the trial court erred in concluding that the dispute resolution provision at issue did not "explicitly nor clearly" require the parties to arbitrate their disputes, and in finding the provision was too vague to fall within the rule requiring that all doubts be resolved in favor of arbitration. CIGNA notes that an arbitration agreement, to be enforceable, need not contain any certain phraseology, but need only to show a clear intent to mandate binding dispute resolution before an out-of-court third party. CIGNA argues that an arbitration provision is ordinarily not invalid as being too vague even if the provision fails to specify who would arbitrate the dispute, where the arbitration would occur, or which arbitration rules would apply. Therefore, CIGNA argues, this Court should reverse and find that the dispute resolution provision compels arbitration.

Urology Associates, on the other hand, maintains that the trial court correctly found that there was no agreement to arbitrate and argues that the dispute resolution provision merely offers arbitration as an option for dispute resolution. Urology Associates also contends that the provision at issue is too vague and imprecise to enforce.

We review the trial court's decision de novo upon the record, with a presumption of correctness afforded to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *Porter v. Money Tree Fin. Corp.*, No. E2001-01142-COA-R3-CV, 2001 Tenn. App. LEXIS 873, at *5 (Tenn. Ct. App. Nov. 28, 2001); Tenn. R. App. P. 13(d). The trial court's conclusions of law are reviewed de novo, with no presumption of correctness. *Porter*, 2001 Tenn. App. LEXIS 873, at *6. The sole issue in this case is whether the trial court properly interpreted the dispute resolution provision referenced in the parties' Agreement. The interpretation of a contract presents a question of law, reviewed de novo, affording no presumption of correctness to the trial court's interpretation. *See Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 147 (Tenn. Ct. App. 2001); *Knaffl v. Douglas Co.*, No. 03A01-9901-CH-00006, 1999 Tenn. App. LEXIS 699, at *5 (Tenn. Ct. App. Oct. 15, 1999); *see also Carolyn B. Beasley Cotton Co. v. Ralph*, 59 S.W.3d 110, 113 (Tenn. Ct. App. 2000).

CIGNA first argues that the Federal Arbitration Act ("FAA"), which is applicable to arbitration agreements involving interstate commerce, governs this contract because, among other things, some of the plan participants are out-of-state residents. *See* 9 U.S.C. § 2; *Tennessee River Pulp & Paper Co. v. Eichleay Corp.*, 637 S.W.2d 853, 858 (Tenn. 1982). Urology Associates, on the other hand, contends that this contract is governed by the Tennessee Uniform Arbitration Act

---

[7]The trial court's order denying the motion to dismiss or to stay litigation and compel arbitration is appealable pursuant to Tennessee Code Annotated § 29-5-319(a)(1).

("TUAA"), because it involves a dispute between a Tennessee physician's group and a Tennessee insurance company. Regardless, Urology Associates maintains that the outcome would be the same under either body of law. The issue on appeal, however, is a matter of contractual interpretation. Consequently, both federal and state cases are instructive, and we need not reach the issue of whether the FAA or the TUAA governs this agreement. *See, e.g., Clanton v. Morgan Keegan & Co.*, 1987 Tenn. App. LEXIS 3165, at \*2-\*3 (Tenn. Ct. App. Feb. 10, 1987) (determining, as an initial matter, that the federal substantive law governed the case).

CIGNA argues on appeal that the dispute resolution provision must be broadly construed in favor of arbitration, in accordance with the strong policy favoring arbitration. Indeed, the TUAA "embodies a legislative policy favoring enforcement of agreements to arbitrate." *Buraczynski v. Eyring*, 919 S.W.2d 314, 317 (Tenn. 1996); *see also Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (acknowledging the "liberal federal policy favoring arbitration"). Therefore, courts must give an arbitration agreement as broad a construction as the words and intentions of the parties will allow. *See Merrimack*, 59 S.W.3d at 149; *Wachtel v. Shoney's Inc.*, 830 S.W.2d 905, 908 (Tenn. Ct. App. 1991). This policy, however, is applied with respect to the *scope* of an arbitration agreement, not to the question of whether there is an enforceable arbitration agreement. *See Adamovic v. METME Corp.*, 961 F.2d 652, 654 (7th Cir. 1992) ("[T]he scales tip in favor of arbitration . . . , but only after we find, as an initial matter, that an enforceable arbitration clause exists."); *Bangor Hydro-Electric Co. v. New England Tel. & Tel. Co.*, 62 F. Supp. 2d 152, 156 n.6 (D. Me. 1999) ("[T]his policy [favoring arbitration] applies only to the interpretation of the scope of an arbitration agreement, rather than to the question of whether such an agreement exists in the first place."). Here, the dispositive issue is whether the parties agreed to arbitrate their disputes. Thus, the policy in favor of enforcing agreements to arbitrate is inapplicable.

To determine whether an agreement to arbitrate exists, the arbitration provision must be reviewed in the context of the entire agreement as a whole. *In re: Estate of Wyatt (Engman v. Vista Family of Mut. Funds)*, No. 02A01-9706-PB-00132, 1998 Tenn. App. LEXIS 595, at \*7-\*8 (Tenn. Ct. App. Aug. 17, 1998). The "[c]ontractual terms should be given their ordinary meaning . . . and should be construed harmoniously to give effect to all provisions and to avoid creating internal conflicts." *Id.* at \*8 (quoting *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996) (internal citations omitted)). As in other contracts, there is no need to apply rules of construction when the language clearly reveals the intent of the parties. *See Rebound Care Corp. v. Universal Constructors, Inc.*, No. M1999-00868-COA-R3-CV, 2000 Tenn. App. LEXIS 384, at \*13 (Tenn. Ct. App. June 13, 2000). A contract is ambiguous when it is fairly susceptible to two meanings. *See Empress Health and Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190-91 (Tenn. 1973). The fact that the parties may differ as to their respective interpretations of the contract does not render the contract ambiguous. *See Oman Constr. Co. v. Tennessee Valley Auth.*, 486 F. Supp. 375 (M.D. Tenn. 1979). To determine whether a contract is clear or ambiguous, the agreement should be considered as a whole. *Rebound*, 2000 Tenn. App. LEXIS 384, at \*13. The overriding goal is to ascertain the intent of the parties. *See West v. Laminite Plastics Mfg. Co.*, 674 S.W.2d 310, 313 (Tenn. Ct. App. 1984).

In this case, CIGNA contends that the contract at issue is unambiguous, and, when read as a whole, it clearly mandates that these parties arbitrate their disputes. CIGNA argues that it is not necessary for an arbitration agreement to use particular words or phrases in order to be enforceable; it need only show an intent to mandate resolution of disputes by a third party other than a court. Even if the provision does not specify who would arbitrate the dispute, where the dispute resolution would occur, or which rules apply, the provision is not invalidated as too vague so long as the intent to arbitrate is clear. CIGNA asserts that giving the parties a choice between a "dispute resolution entity" or a "single arbitrator" to resolve their disputes does not destroy the mandatory directive of the provision that "the matter in controversy *shall be* submitted" to one of these tribunals. (Emphasis added). Rather, allowing the parties to choose a "dispute resolution entity" over a "single arbitrator" simply gives the parties the flexibility to choose either an arbitrator or another entity to conduct the arbitration, depending on the circumstances at the time. If the parties cannot agree on an arbitrator or a dispute resolution entity, the court can make that decision for the parties. Indeed, both the Federal Arbitration Act and the TUAA permit a court to designate and appoint an arbitrator or umpire over the parties' dispute where either the arbitration agreement does not establish a method for naming the arbitrator or the parties do not use the specified method. *See* 9 U.S.C. § 5; Tenn. Code Ann. § 29-5-304.

Urology Associates, however, argues that giving the parties the option to choose a "dispute resolution entity" instead of a "single arbitrator" undermines CIGNA's claim that arbitration under the provision is mandatory. Instead, that language indicates that the parties could choose something other than arbitration to settle their disputes, including mediation, litigation in court, or even the toss of a coin. Moreover, the second sentence of the paragraph confirms that arbitration is merely an option, inasmuch as it outlines how the parties should proceed if the matter is submitted to arbitration. Urology Associates also contends that the trial court was correct in holding that the provision at issue is simply too vague, imprecise and impractical to enforce, noting that any ambiguity should be construed against the drafter of the agreement, namely, CIGNA.

The term "arbitration" is not explicitly defined in the TUAA, the FAA, or in the contract at issue. BLACK'S LAW DICTIONARY defines arbitration as "a method of dispute resolution involving one or more neutral third parties who are usu[ally] agreed to by the disputing parties and whose decision is binding. – Also termed (redundantly) *binding arbitration*." BLACK'S LAW DICTIONARY 100 (7th ed.1999). This definition contemplates that any "method of dispute resolution" could constitute arbitration, so long as the method is conducted by one or more third parties and is binding on the parties to the contract. *Id.* Tennessee cases define arbitration much the same, holding that arbitration is "a consensual proceeding in which the parties select decision-makers of their own choice and then voluntarily submit their disagreement to those decision-makers for resolution in lieu of adjudicating the dispute in court." *Merrimack*, 59 S.W.3d at149; *see Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 206 (Tenn. Ct. App. 1999) (stating that arbitration is "an 'adjudication' of conflicting interests by a neutral third party"); *see also Blount Excavating, Inc. v. Denso Mfg. Tenn., Inc.*, No. 03A01-9903-CV-00112, 1999 Tenn. App. LEXIS 779, at *10 (Tenn. Ct. App. Nov. 30, 1999) (adhering to the definition in *Smith* and adopting the position that arbitration is simply an agreement to allow a third party to resolve disputes).

Federal courts have similarly defined the term, stating that "arbitration is the reference of a particular dispute to an impartial third person chosen by the parties to the dispute who agree in advance to be bound by the award." *General Motors Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 246 (5th Cir. 1998); *see also Harrison v. Nissan Motor Corp.*, 111 F.3d 343, 350 (3d Cir. 1997) ("[T]he essence of arbitration, we think, is that, when the parties agree to submit their disputes to it, they have agreed to arbitrate these disputes through to completion, *i.e.* to an award made by a third-party arbitrator."); *Parisi v. Netlearning, Inc.*, 139 F. Supp. 2d 745, 749 (E.D. Va. 2001) (stating that "courts have liberally construed that term [arbitration] to encompass various diverse dispute-settlement mechanisms"). Federal courts have enforced agreements under the FAA when something other than "arbitration" is required, so long as the parties have agreed to submit their disputes to an independent third party for final resolution. *See Powderly v. Metrabyte Corp.*, 866 F. Supp. 39, 42 (D. Mass. 1994) (stating that an agreement to submit disputes to a public accountant is an enforceable arbitration agreement, reasoning that "[t]he use of the term arbitrate is not a vital ingredient to an agreement to do so"); *see also CB Richard Ellis, Inc. v. American Envtl. Waste Mgmt.*, No. 98-CV-4183 (JG), 1998 U.S. Dist. LEXIS 20064, at *3-*4 (E.D.N.Y. Dec. 4, 1998) (enforcing a mediation agreement under the FAA, because it is a process that will "settle" the controversy); *Cecala v. Moore*, 982 F. Supp. 609, 613-614 (N.D. Ill. 1997) (enforcing a mediation clause under the state arbitration act).

In this case, the dispute resolution provision requires aggrieved physicians to submit their disputes to a third party for resolution, whether it be a "dispute resolution entity" or a "single arbitrator," and it compels the parties to be bound by the determination of that third party. While the physician may choose a "dispute resolution entity" as opposed to a "single arbitrator," an arbitration agreement need not contain "magic words" or "follow a particular form or phraseology." *AMF Inc. v. Brunswick Corp.*, 621 F. Supp. 456, 460 (E.D.N.Y. 1985); *Sumaza v. Cooperative Ass'n*, 297 F. Supp. 345, 347 (D.P.R. 1969). It need only require that parties submit their disputes to a third party for a decision that is binding on the parties. Therefore, the dispute resolution provision at issue contains all of the elements necessary to constitute an enforceable agreement to arbitrate.

Urology Associates argues that the term "dispute resolution" can, in the most literal sense, mean anything from a court to a toss of the coin. From a reading of the entire provision, however, it is readily apparent that the parties did not intend for a court to be a "dispute resolution entity" to resolve disputes. Indeed, the trial court noted the portion of the dispute resolution provision stating that a "[j]udgment upon the award rendered by the resolution entity may be entered in any court having jurisdiction," and also stating that "[b]oth parties expressly covenant and agree to be bound by the decision of the dispute resolution entity or arbitrator as final determination of the matter in the dispute." We agree with the trial court's observation that "[f]inal determination implies that a court proceeding is not an option." The dispute resolution provision in this case, while hardly a model of clarity, overall evidences a clear intent to require the parties to submit their disputes to a third party for a binding decision. This is sufficient to conclude that arbitration is mandatory, and that the trial court erred in denying CIGNA's motion to compel arbitration.

CIGNA asserts that, if we find that the dispute resolution provision constitutes an enforceable agreement to arbitrate, we should also address whether the Program Requirements are incorporated into the main agreement, and whether the parties, therefore, are bound by the arbitration provisions therein. CIGNA further asks this court to address whether, under the common-law doctrine of merger, the amended Program Requirements superceded the old requirements, rendering the original Program Requirements unenforceable. The trial court below did not address these issues, and we need not address them on appeal. Rather, we remand the cause to the trial court to determine these issues in the first instance and for any other proceedings necessary in light of our holding. All other issues raised by the parties are pretermitted.

Accordingly, the decision of the trial court is reversed and remanded to the trial court to proceed in a manner not inconsistent with this Opinion. Costs on appeal are taxed to the appellee, Urology Associates, P.C., for which execution may issue, if necessary.

 

_____
HOLLY KIRBY LILLARD, JUDGE