# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### September 25, 2013 Session

## ARTIST BUILDING PARTNERS and HOWARD CAUGHRON v. AUTO-OWNERS MUTUAL INSURANCE COMPANY

**Direct Appeal from the Circuit Court for Davidson County**
**No. 07C-112     Thomas W. Brothers, Judge**

---

**No. M2012-00915-COA-RM-CV - Filed November 21, 2013**

---

This appeal involves a dispute between an insurer and its insured following a fire loss at a commercial building.  The case was resolved by a series of motions for partial summary judgment.  The issues on appeal involve the amount of damages owed by the insurer for the insured's lost business income during the period of restoration of the building following the fire.  The insurer relies upon two separate provisions of the insurance policy to argue that its obligation to pay for lost business income was limited to either six or, at most, twelve months.  The trial court denied the insurer's motions for partial summary judgment and granted the motions for partial summary judgment filed by the insured, holding that the insurer's obligation to pay was not limited to either a six-month or a twelve-month period.  The insurer appeals.  We affirm and remand for further proceedings as may be necessary.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

W. Timothy Harvey, Rebecca J. Garman, Clarksville, Tennessee, for the appellant, Auto-Owners Mutual Insurance Company

Raymond G. Prince, Nashville, Tennessee, for the appellees, Artist Building Partners and Howard Caughron

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Artist Building Partners and Howard Caughron ("Plaintiffs") owned a commercial building located at 50 Music Square West in Nashville, Tennessee. The building was damaged by fire on June 13, 2005. Plaintiffs maintained an insurance policy on the premises with Auto-Owners Mutual Insurance Company ("Insurer"). In addition to coverage for damages to the structure, Plaintiffs' insurance policy also provided coverage for lost business income and extra expense incurred during the period of restoration, under certain circumstances. In other words, the policy provided a form of business interruption insurance.[1]

Insurer did not deny that the damage incurred as a result of the fire was in fact covered by the policy, and it also conceded that Plaintiffs were entitled to some amount of recovery for their lost business income. In fact, Insurer made several payments to Plaintiffs for damages to the building, and for lost business income and extra expense, during the months after the fire. However, the parties were unable to agree as to the precise sums owed by Insurer, and Plaintiffs filed this lawsuit on January 11, 2007, to recover additional sums for damages to the building and for lost business income. Plaintiffs' complaint alleged that Insurer had breached the policy of insurance by failing to pay the entire amounts owed for Plaintiffs' covered losses. The complaint also alleged that Insurer's actions constituted a bad faith refusal to pay, rendering it liable for damages pursuant to Tennessee Code Annotated section 56-7-105, and constituted unfair or deceptive acts or practices in violation of the Tennessee Consumer Protection Act ("TCPA"), Tennessee Code Annotated section 47-18-101, et seq. Plaintiffs sought a judgment for all sums due under the policy, prejudgment interest, statutory damages for bad faith refusal to pay, and treble damages and attorney's fees pursuant to the TCPA.

---

[1] "The purpose of business interruption insurance is to protect the insured against losses that occur when its operations are unexpectedly interrupted, and to place it in the position it would have occupied if the interruption had not occurred." *Continental Ins. Co. v. DNE Corp.*, 834 S.W.2d 930, 934 (Tenn. 1992).

Shortly after the complaint was filed, an agreed order was entered on March 14, 2007, which stated that Insurer had invoked the appraisal provision of the insurance policy, and therefore, the parties agreed that the case would be stayed pending finalization or resolution of the appraisal proceedings. The policy's appraisal provision provided, in pertinent part:

a.      Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will b[e] binding. Each party will:

(1) Pay its chosen appraiser; and
(2) Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

The policy further provided that Insurer would pay for a covered loss within thirty days after receiving a sworn proof of loss if an appraisal award had been made and the insured had complied with all of the terms of the coverage part.

Pursuant to the appraisal provision, Insurer submitted three specific questions to the appraisal panel: (1) the actual cash value of the damages to the building, less reasonable depreciation; (2) the actual business income loss incurred; and (3) the reasonable time frame within which the repairs to the building should have been completed. Each of the parties selected an appraiser, and the two appraisers selected an umpire. The appraiser selected by Plaintiffs ultimately agreed with the umpire's decisions, and they submitted a binding appraisal award on October 16, 2007. The appraisal award stated, in relevant part:

We, the undersigned, have appraised, determined and do hereby establish the loss and make the following appraisal award, pursuant to and subject to the terms of the insurance policy:

**Value of Building, June 12, 2005:**

-3-

$2,250,000.00

**Actual Cash Value of the damages to the building less reasonable depreciation:**
$1,627,330.14

**Actual business income loss incurred:**
$1,060,297.66 (from June, 2005 to April, 2008)

**The reasonable time frame within which the repairs to the building should have been completed:**
6 months from date construction begins

Within days of the appraisal award, Plaintiffs sent to Insurer a copy of the appraisal award and a sworn statement in proof of loss, demanding payment in accordance with the amounts listed in the appraisal award. One month after the appraisal award was entered, on November 16, 2007, Insurer sent Plaintiffs a check for $322,056.94 in accordance with the appraisal award for the actual cash value of the damage to the building, as the appraisal award valued the damage at $1,627,330.14, and Insurer had already made previous payments for the damage totaling $1,305,273.20. There was no further dispute between the parties as to the amount owed for the damage to the building after this $322,056.94 payment was made in November 2007. However, with regard to the amount owed for lost business income, Insurer paid only a fraction of the amount referenced in the appraisal award. Specifically, the appraisal award had calculated the "Actual business income loss incurred" as "$1,060,297.66 (from June, 2005 to April, 2008)." A small portion of this sum represented extra expense incurred by Plaintiffs ($45,819), for which Insurer had already paid, and therefore the amount of the award attributable to lost business income was $1,014,478.66. Insurer took the position that this amount represented the *total* amount of actual business income loss incurred by Plaintiffs, but that Insurer was only obligated to pay Plaintiffs for lost business income for a twelve-month period, pursuant to the policy. Therefore, Insurer divided the $1,014,478.66 sum by a total of 35 months, to reach an average monthly business income loss of $28,985.10 per month, then it multiplied that figure by twelve months, to determine that it only owed Plaintiffs for a twelve-month total of $347,821.20 in lost business income.[2] Because Insurer had previously paid Plaintiffs $221,792 for lost business income, it paid only $126,029.20 more after the appraisal award, maintaining that its payment of $347,821.20

---

[2] By our calculation, $1,014,478.66 divided by 35 equals $28,9<u>85</u>.10 per month, although the parties repeatedly referenced a figure of $28,9<u>58</u>.10 per month. This appears to have been a simple typographical error by the parties, as the correct figure was apparently used to reach the 12-month total of $347,821.20. Due to our resolution of the issues on appeal, it is not necessary for us to address this discrepancy further.

satisfied its obligation under the policy and the appraisal award.

The provision of the insurance policy upon which Insurer relied in support of its twelve-month argument was found in the policy's Business Income and Extra Expense endorsement, which provided, in relevant part:

> . . . we will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration" and necessary Extra Expense you incur during the "period of restoration" that occurs within 12 consecutive months after the date of the direct physical loss of or damage to property at the described premises, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Cause of Loss. This is an additional amount of insurance.

On April 16, 2008, Plaintiffs filed a motion for partial summary judgment "limited strictly to Plaintiffs' claim for lost business income."[3] First, Plaintiffs argued that the twelve-month limitation found in the aforementioned provision only applied to the policy's Extra Expense coverage, not to the Business Income coverage mentioned near the beginning of the sentence. In other words, Plaintiffs interpreted the provision to mean that Insurer would pay "for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'" and also for "necessary Extra Expense you incur during the 'period of restoration' that occurs within 12 consecutive months after the date of the direct physical loss of or damage to property[.]" Alternatively, Plaintiffs argued that the provision was ambiguous as to whether the twelve-month limitation applied to one or both types of coverage, and therefore, Plaintiffs argued, the provision should be construed against Insurer and in favor of coverage. Based upon Plaintiffs' position that there was no twelve-month limitation on the recovery of lost business income, Plaintiff further argued that the appraisal award had established the amount of lost business income to which Plaintiff was entitled at $1,014,478.66 (or $1,060,297.66 if extra expense was included).

Insurer filed a response to Plaintiffs' motion for summary judgment, in which Insurer argued that the policy unequivocally limited recovery to twelve months for not only extra expense but also lost business income. Insurer relied upon the lack of separating punctuation in the sentence at issue, and the fact that some other provisions of the policy that treated business income loss and extra expense differently did so by using a separate paragraph to address each type of coverage. Aside from its response to Plaintiffs' motion for partial summary judgment on this issue, Insurer also filed its own motion for partial summary

---

[3] The motion stated specifically that it was not directed toward Plaintiffs' claims for damages to the building, damages for bad faith, or those applicable under the TCPA.

judgment, essentially restating its argument that the twelve-month limitation unambiguously applied to both business income and extra expense coverage. Insurer argued that it had fulfilled its obligations under the policy by paying Plaintiffs for twelve-months of coverage after the appraisal award was entered, and it claimed that it did not owe any further sums under the policy.

Following a hearing on both parties' competing motions for summary judgment, the trial court entered an order granting in part the motion filed by Plaintiffs. The trial court found that the provision at issue was "ambiguous as to whether or not the twelve consecutive month limitation pertains both to Business Income and Extra Expense or only to Extra Expense." The court concluded that "the more reasonable interpretation of the above provision is that the twelve consecutive month limitation pertains only to Extra Expense." Nevertheless, finding an ambiguity at the very least, the trial court held that the provision must be construed against Insurer and in favor of coverage. The trial court accordingly entered partial summary judgment in favor of Plaintiffs to the extent that the twelve-month limitation was held to apply only to Extra Expense and not to Business Income Loss coverage. Regarding Plaintiffs' additional contention that the appraisal award had conclusively established the amount of Plaintiffs' lost business income as $1,060,297.66, the trial court denied Plaintiffs' motion for partial summary judgment, finding that "the extent of the 'period of restoration' under paragraph 4 of the Endorsement at issue is not totally clear and that, therefore, a question of fact exists." Insurer's motion for partial summary judgment was denied in its entirety.

After the trial court ruled that the twelve-month limitation did not apply to lost business income, Plaintiffs demanded from Insurer the remaining $712,476.46 in lost business income that Plaintiffs claimed was due under the appraisal award, in addition to prejudgment interest. Plaintiffs were granted leave to file an amended complaint, which generally provided updated information about the amounts paid by Insurer and the amounts that Plaintiffs claimed were still owing under the policy. In its answer to Plaintiffs' amended complaint, Insurer argued, for the first time, that Plaintiffs were actually only entitled to *six* months of lost business income, due to the findings of the appraisal panel. Thus, Insurer claimed that by paying Plaintiffs for twelve months of lost business income after the appraisal award, it had actually overpaid Plaintiffs, and it asserted a counterclaim for a refund of one-half of the amount it had previously paid. Insurer also filed a motion for partial summary judgment based upon these issues. Insurer's arguments were based upon the policy's statement that Insurer would pay "for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration[.]'" The policy defined the "period of restoration" as follows:"Period of Restoration" means the period of time that:

a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

Insurer pointed out that the appraisal award had established "[t]he reasonable time frame within which the repairs to the building should have been completed" as "6 months from date construction begins." Insurer argued that the period of restoration had therefore been "established at six (6) months by the Appraisal Award." Thus, according to Insurer, the appraisal award conclusively established that Plaintiffs were only entitled to recover six months of lost business income.

Plaintiffs filed a memorandum in opposition to Insurer's motion along with their own motion for partial summary judgment on this issue. Plaintiffs basically argued that the appraisal award did not establish the period of restoration at only six months. According to Plaintiffs, Insurer was placing too much emphasis on the appraisal award's use of the words "6 months" in one section of the award, while ignoring the rest of the language in the award. As previously noted in this opinion, the signed appraisal award, dated October 2007, stated, in relevant part:

**Actual business income loss incurred:**
$1,060,297.66 (from June, 2005 to April, 2008)

**The reasonable time frame within which the repairs to the building should have been completed:**
6 months from date construction begins

The second page the umpire prepared, which the parties referred to as the "worksheet" or the "explanation page," listed the umpire's findings in more detail. It listed the "actual business income loss incurred" as "1,014,478.66 (from June 05 to April 08 – additional 6 months to complete)." The extra expense cost of $45,819, already paid by Insurer, was added to that sum to reach the total of $1,060,297.66. Beneath this calculation, the worksheet listed "6 months" as the "reasonable time frame within which the repairs to the building should have been completed."

In support of their motion for summary judgment, Plaintiffs submitted the affidavit of the appraiser whom they had selected for the appraisal panel, Cason Dickinson. Mr. Dickinson stated that when he agreed with the umpire's finding as to the reasonable time frame for repairs, he and the umpire both agreed that the six-month period would run from

the date of the appraisal award, in October 2007, and end in April 2008. Mr. Dickinson stated that all three members of the appraisal panel had discussed the reasonable time frame within which repairs should have been completed, and their respective proposals were listed on the explanations page that accompanied the appraisal award. Mr. Dickinson said he initially proposed an eight-month period for completing repairs that would end in January 2009, while the appraiser selected by Insurer proposed a six-month period that would have ended in May 2006. Thus, according to Mr. Dickinson, none of the three members of the appraisal panel proposed that repairs should have been completed within six months of the June 2005 fire loss, or that Plaintiffs would not be entitled to lost business income after that time. Plaintiffs also submitted in support of their motion for summary judgment a letter that was obtained during discovery that was written by Insurer's appraiser after the appraisal award. In that letter, Insurer's appraiser referenced the appraisal award and stated, "apparently, the Umpire believed the delays in renovation were the fault of the insurance company and not a calculated decision on the part of the Owner."

In sum, Plaintiffs argued that the "period of restoration" had been clearly established by the appraisal award, the policy, the affidavit of Plaintiffs' appraiser, and the letter from Insurer's appraiser which acknowledged the umpire's reasoning. Plaintiffs contended that reasonable minds could not differ as to the conclusion that the period of restoration ended in April 2008, six months after the appraisal award. Accordingly, Plaintiffs claimed that they were entitled to partial summary judgment on the issue of lost business income and a judgment for $1,060,297.66, less credits for Insurer's previous payments. Insurer filed a response to Plaintiffs' motion, noting the lack of evidence from the umpire regarding her position, and pointing out that the only explanation submitted by Plaintiffs had come from Plaintiffs' own appraiser.

Prior to the hearing on these motions for partial summary judgment (on the alleged six-month limitation), Insurer filed an amended and supplemental motion in which it asked the trial court to reconsider its previous ruling, from two years earlier, as to the meaning of the twelve-month limitation. In support of its motion to reconsider, Insurer submitted the affidavit of a Research Assistant Professor of Education at Vanderbilt University, Dr. Alene Hawes Harris, who had prepared a diagram of the sentence at issue and rendered an opinion as to its meaning. Again, the sentence at issue stated, "we will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration' and necessary Extra Expense you incur during the 'period of restoration' that occurs within 12 consecutive months after the date of the direct physical loss of or damage to property at the described premises[.]" Dr. Harris opined, "[b]ased upon [her] expert opinion," that "the phrase 'within 12 consecutive months' properly structured modifies the noun 'Business Income' as well as 'Extra Expense.'" Therefore, Dr. Harris concluded that "the phrase 'within 12 consecutive months' limits both the 'Business Income' and the

'Extra Expense.'"

Following a hearing on these motions, the trial court reaffirmed its previous ruling as to the twelve-month limitation, despite the affidavit of Dr. Harris, finding again that "the twelve consecutive month provision above is meant to apply only to extra expense and not to loss of business income." The trial court denied Insurer's motion to amend its previous finding in that regard. With respect to the alleged six-month limitation, the trial court reserved ruling on the parties' cross-motions for partial summary judgment, finding that a contested issue of fact remained as to the umpire's findings concerning the period of restoration in the appraisal award. The trial court directed the parties to depose the umpire as soon as possible.

The umpire, Amy Smith, subsequently submitted an affidavit in which she attempted to clarify and explain her findings regarding the period of restoration. She also sought a protective order that would define and limit the scope of her deposition to specific areas of inquiry, directed at clarifying the appraisal award to the extent that it was ambiguous, and excluding inquiry as to her opinions, thoughts, or communications that were not contained in the appraisal award. Umpire Smith noted that there was no allegation of fraud, manifest mistake, bias, inadequacy or excessiveness of the award, and therefore, she contended that the scope of inquiry should be limited to that sufficient to permit the court and the parties to understand the meaning of the appraisal award.

It is not clear from the record whether the trial court ruled on the appraiser's motion for a protective order, but the deposition of Umpire Smith did take place on June 14, 2011. Thereafter, Insurer served Umpire Smith with a subpoena for "a complete copy of any and all notes, records, correspondence, and the entire (file) you have regarding the United Artist Building and your work as the Umpire for [this lawsuit]." Umpire Smith then filed a motion to quash the subpoena, or in the alternative, for a protective order. She asserted that the subpoena was unreasonable and oppressive. Umpire Smith noted that the trial court had ordered that her deposition be taken due to perceived ambiguities in her findings regarding the period of restoration in the appraisal award. Umpire Smith pointed out that the disputed issue regarding the period of restoration "was discussed numerous times and in numerous ways" during her recent deposition. Umpire Smith claimed that she had consistently explained her position to the parties and/or their attorneys through correspondence, her affidavit, and again during the deposition. She claimed that her notes, records, and correspondence in her file were not necessary to further explain the appraisal award's finding as to the period of restoration. Umpire Smith cited the insurance policy's provision that a finding of the umpire and appraiser would be "binding," and she claimed she had already provided sufficient information for the parties to understand the meaning of the award. Following a hearing, the trial court granted Umpire Smith's motion to quash the subpoena,

finding that its demand for all notes and records "constitutes an oppressive request under the facts and circumstances presented, is unduly burdensome, and is not reasonably calculated to lead to the discovery of additional admissible evidence."

During her deposition, Umpire Smith had agreed that her role as an umpire was governed by the applicable clauses of the insurance policy. She testified that it was necessary for her to review at least portions of the insurance policy in order to reach her factual conclusions as to the values that were submitted to appraisal. She testified that she reviewed the policy's provisions regarding the actual business income loss incurred as well as the extra expense that was associated with business income loss. According to Umpire Smith, she looked at the policy to see the categories and descriptions of these losses so that she would understand substantively how to evaluate the factual information before her. As previously noted, one of the questions submitted to the appraisal process was "the actual business income loss incurred." The policy provided that Insurer would pay "for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.'" It defined the "period of restoration" as beginning on the date of loss and ending "on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality." Thus, Umpire Smith stated that determining the "reasonable timeframe within which the repairs to the building should have been completed" was "part and parcel" of the decision regarding the "actual business income loss" incurred. Umpire Smith explained that she calculated the actual business income loss "based on the terms in the policy of what period of restoration meant as I believed reasonably that I should have answered the question." Umpire Smith explained that substantial construction had not begun at the time of the appraisal award, but Plaintiffs had taken steps to clean up and preserve the structure. She testified that she concluded that the date when the property should be repaired, rebuilt, or replaced with reasonable speed and similar quality was April 2008. She testified that it was her opinion that substantial construction could begin in October 2007, when the appraisal award was made, and that it could be completed within six months of the date when substantial construction began, which would be in April 2008. Umpire Smith noted that the appraisal award specifically stated that actual business income loss was computed as "$1,060.297.66 (from June, 2005 to April, 2008)."

Umpire Smith suggested that the calculation at the bottom of the appraisal award page that listed six months as the "reasonable time frame within which the repairs to the building should have been completed" was actually an unnecessary finding because the period of restoration had already been determined in the context of calculating the actual loss of business income. She reiterated that the period of restoration was calculated as beginning with the date of loss in June 2005 and ending in April 2008. Umpire Smith denied any suggestion that the appraisal award set the period of restoration as six months beginning with

the date of the fire. She further denied that a comparison of the factual finding in the appraisal award with the policy's definition of period of restoration would lead one to conclude that the period of restoration was six months. Umpire Smith said, "[m]y intent was that that [six month entry] would be read in connection with the actual business income loss incurred number. And I tried to set that out on Page 2." She reiterated that, according to the appraisal award, repairs could be made within six months of the date of the appraisal award, because that is when she expected that substantial construction would begin. Accordingly, she explained, the appraisal award calculated the business income loss from June 2005 through April 2008.

Based upon the deposition testimony of Umpire Smith, Plaintiffs filed a renewed motion for partial summary judgment on the issue of lost business income. Plaintiffs claimed that Umpire Smith's deposition testimony "entirely corroborate[d]" their previous contention that both the Umpire and Mr. Dickinson had agreed that the period of restoration began on the date of loss in June 2005 and ended in April 2008, six months after the appraisal award. Plaintiffs argued that the appraisal award therefore established Plaintiffs' actual business income loss and extra expense at $1,060,297.66, and that they were entitled to a judgment for that amount, minus previous payments made by Insurer of $393,640.20, for a resulting judgment of $666,657.46, in addition to prejudgment interest.

Insurer also renewed its own motion for partial summary judgment in light of Umpire Smith's deposition testimony. Insurer argued that the appraisal panel was only authorized to determine the value of the damages incurred, and it argued that the appraisal panel had impermissibly resolved coverage and liability questions that were beyond the scope of the appraisal by attempting to determine the period of restoration. Insurer claimed that the appraisal panel was only authorized to determine the reasonable time frame for completing repairs, regardless of when and if construction had begun. Insurer asserted that the trial court was obligated to apply the six-month finding by the appraisal panel to the definition of the period of restoration, and to find that the period of restoration ended six months after the date of the fire.

Following a hearing on the renewed motions for summary judgment, the trial court entered an order granting the Plaintiffs' motion and denying the motion filed by Insurer. The trial court based its ruling on the following findings:

1. Under the appraisal clause of the Business Income and Extra Expense Endorsement a decision as to the amount of loss of business income agreed to by any two of the three members of the appraisal panel is binding;

2. In determining the amount of lost business income, the appraisal panel

necessarily determined the Period of Restoration;

3.    Both Plaintiffs' Appraiser Cason Dickinson and Umpire Amy Smith agreed that the "Period of Restoration" began on the date of loss, June 13, 2005, and ended six months after the Appraisal Award was signed on October 16, 2007;

4.    Under the appraisal clause of the policy, the agreement by Mr. Dickinson and Ms. Smith established that the actual business income loss and extra expense incurred was $1,060,297.[6]6;

5.    Plaintiffs are entitled to a judgment for the above sum less $393,640.20 in credits claimed by the Defendant, for a total of $666,657.46[.]

The trial court also found that Plaintiffs were entitled to prejudgment interest on the unpaid sum of $666,657.46 beginning November 17, 2007, approximately one month after the date of the appraisal award. The trial court dismissed Insurer's counterclaim for a refund of six months of lost business income.

The trial court designated its orders on the various motions for partial summary judgment as final pursuant to Tennessee Rule of Civil Procedure 54.02 because they "dispose[d] of the entire breach of contract claim asserted by the Plaintiffs." Insurer timely filed a notice of appeal to this Court on January 11, 2012.

On appeal, this Court ruled, in *Artist Building Partners v. Auto Owners Mut. Ins. Co.*, No. M2012-00157-COA-R3-CV, 2012 WL 6757940 (Tenn. Ct. App. W.S. Dec. 28, 2012), that the trial court's orders granting partial summary judgment were improvidently certified as final because Plaintiffs' claims for bad faith refusal to pay and violation of the TCPA arose out of the same operative facts and remained pending before the trial court. Therefore, we dismissed Insurer's appeal. The Tennessee Supreme Court granted Insurer's application for permission to appeal and remanded to the Court of Appeals for reconsideration. The Supreme Court was "not convinced" that the orders appealed failed to dispose of an entire "claim" before the trial court, but the Court found that it was not necessary to resolve that question because the parties agreed that all issues had since been resolved in the trial court. Thus, the Supreme Court concluded that there was good cause to suspend the finality requirement of the appellate rules and to remand the case to this Court for reconsideration.

## II. ISSUES PRESENTED

Insurer presents the following issues for review on appeal:

1. Did the trial court err in holding that the insurance policy's twelve-month limitation in the Business Income and Extra Expense endorsement only applied to Extra Expense coverage and not to Business Income Loss coverage;

2. Did the trial court err by failing to limit the Business Income and Extra Expense coverage to a six-month period of restoration due to the appraisal award, and instead finding that Plaintiffs were entitled to thirty-five months of benefits, awarding Plaintiffs a judgment in the amount of $1,060,297.66, less $393,640.20 in credits for twelve months of benefits already paid by Insurer; and

3. Did the trial court err in granting Umpire Smith's motion to quash, or in the alternative, for protective order, thereby denying Insurer the opportunity to discover and review Umpire Smith's entire file materials involving this matter as subpoenaed?

For the following reasons, we affirm the decision of the circuit court and remand for further proceedings as may be necessary.

## III. STANDARD OF REVIEW

A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "The party seeking the summary judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law." *Green v. Green*, 293 S.W.3d 493, 513 (Tenn. 2009) (citing *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008); *Amos v. Metro. Gov't of Nashville & Davidson County*, 259 S.W.3d 705, 710 (Tenn. 2008)). The resolution of a motion for summary judgment is a matter of law, which we review de novo with no presumption of correctness. *Martin*, 271 S.W.3d at 83.

-13-

## IV.   DISCUSSION

### A.   *The Alleged Twelve-Month Limitation*

Insurer's first argument on appeal is that the trial court erred in concluding that the insurance policy did *not* limit the recovery of lost business income to twelve months.  "In general, courts should construe insurance policies in the same manner as any other contract." ***Lancaster v. Ferrell Paving, Inc.***, 397 S.W.3d 606, 610 (Tenn. Ct. App. 2011) (citing *American Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn. 2000)).  An insurance policy must be interpreted fairly and reasonably, giving the language its usual and ordinary meaning, ***Naifeh v. Valley Forge Life Ins. Co.***, 204 S.W.3d 758, 768 (Tenn. 2006), and taking the policy language in its plain, ordinary, and popular sense. ***Hutchison***, 15 S.W.3d at 814.  We review a trial court's interpretation of contract language de novo with no presumption of correctness. ***Lancaster***, 397 S.W.3d at 610 (citing *Travelers Indem. Co. of America v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 305 (Tenn. 2007)).

The provision at issue,[4] found in the policy's Business Income and Extra Expense endorsement, bears repeating here:

> . . . we will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration" and necessary Extra Expense you incur during the "period of restoration" that occurs within 12 consecutive months after the date of the direct physical loss of or damage to property at the described premises, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Cause of Loss.

Simply put, Insurer claims that the phrase "within 12 consecutive months" relates back to *both* business income and extra expense.  Insurer points to the lack of separating punctuation between the twelve-month limitation and the words that preceded it.  Insurer claims that if the twelve-month limitation was only meant to apply to extra expense, some effort would

---

[4] We note that our research has not revealed any cases interpreting a policy provision identical to the one at issue.  Although there are a few Tennessee cases involving business interruption insurance, the language of the policies in those cases differed from the policy language here, and the cases generally involved different issues. *See, e.g.*, ***Continental Ins. Co. v. DNE Corp.***, 834 S.W.2d 930, 934 (Tenn. 1992) ("We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'.); ***Gates v. State Auto. Mut. Ins. Co.***, 196 S.W.3d 761, 764 (Tenn. Ct. App. 2005) ("We will only pay for loss of Business Income that you sustain during the 'period of restoration' and that occurs within 12 consecutive months after the date of direct physical loss or damage.")

have been made to clearly differentiate between business income and extra expense, such as the use of separating punctuation or even separate paragraphs. Insurer also points to the affidavit of Dr. Harris, the professor whom Insurer describes as an "expert in sentence diagraming." Dr. Harris provided a diagram of the sentence and opined, "[b]ased upon [her] expert opinion," that "the phrase 'within 12 consecutive months' properly structured modifies the noun 'Business Income' as well as 'Extra Expense,'" and therefore the twelve-month limitation "limits both the 'Business Income' and the 'Extra Expense.'"

To the contrary, Plaintiffs interpret the endorsement as limiting the Insurer's obligation to pay for extra expenses incurred "during the 'period of restoration' that occurs within 12 consecutive months after the date of the direct physical loss," while obligating the Insurer to pay for lost business income sustained "during the 'period of restoration,'" without further limitation. Plaintiffs point out that the provision uses the verb "occurs," which, they claim, indicates an intent to refer to a singular noun. Plaintiffs argue that it would be grammatically incorrect to state that the Insurer will pay for "Business Income . . . and Extra Expense . . . that *occurs* within 12 consecutive months[.]"

The trial court concluded that the aforementioned provision was "ambiguous as to whether or not the twelve consecutive month limitation pertains both to Business Income and Extra Expense or only to Extra Expense," although the court noted that, in the court's opinion, "the more reasonable interpretation of the above provision is that the twelve consecutive month limitation pertains only to Extra Expense." Based upon its finding of an ambiguity, the trial court construed the provision against Insurer and in favor of coverage, and it entered partial summary judgment in favor of Plaintiffs on the basis that the twelve-month limitation applied only to Extra Expense and not to Business Income Loss coverage. We agree with the trial court's conclusion.

Language in an insurance policy is ambiguous if it is susceptible of more than one reasonable interpretation. *Tata v. Nichols*, 848 S.W.2d 649, 650 (Tenn. 1993). "Ambiguity in a contract is doubt or uncertainty arising from the possibility of the same language being fairly understood in more ways than one." *Mid-Century Ins. Co. v. Williams*, 174 S.W.3d 230, 240 (Tenn. Ct. App. 2005) (citing *NSA DBA Benefit Plan, Inc. v. Connecticut Gen. Life Ins. Co.*, 968 S.W.2d 791, 795 (Tenn. Ct. App. 1997)). "When a provision that purports to limit insurance is ambiguous, it must be construed against the insurance company and in favor of the insured." *Gates v. State Auto. Mut. Ins. Co.*, 196 S.W.3d 761, 764 (Tenn. Ct. App. 2005) (citing *Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 773 (Tenn. 2004)). In other words, "if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls." *Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012) (citing *Tata*, 848 S.W.2d at 650; *VanBebber v. Roach*, 252 S.W.3d 279, 284 (Tenn. Ct. App. 2007)).

In our view, the Business Income and Extra Expense endorsement is susceptible to more than one reasonable interpretation. It is reasonable to interpret the provision as obligating the Insurer to pay for "the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'" and for "necessary Extra Expense you incur during the 'period of restoration' that occurs within 12 consecutive months after the date of the direct physical loss of or damage to property at the described premises." We acknowledge the contrary opinion of the learned professor, Dr. Harris. However, an insured should not have to resort to retaining an "expert in sentence diagraming" in order to properly interpret his or her insurance policy. An insurance policy must be interpreted fairly and reasonably, giving the language its usual and ordinary meaning. *Naifeh*, 204 S.W.3d at 768. "[T]he 'ordinary meaning' envisioned is the meaning which the average policy holder and insurer would attach" to the policy language. *Swindler v. St. Paul Fire & Marine Ins. Co.*, 223 Tenn. 304, 307, 444 S.W.2d 147, 148 (Tenn. 1969); *see also Harrell v. Minnesota Mut. Life Ins. Co.*, 937 S.W.2d 809, 814 (Tenn. 1996) (noting that "an insured should not have to consult a long line of case law or law review articles and treatises to determine the coverage he or she is purchasing under an insurance policy," and considering what "the average insured would understand").

The interpretation urged by Plaintiffs is certainly reasonable and sensible. Therefore, assuming for the sake of argument that the Insurer's interpretation is also reasonable, the provision at issue is ambiguous. As a result, the interpretation favorable to the insured is controlling. *Garrison*, 377 S.W.3d at 664. We therefore affirm the trial court's decision to grant partial summary judgment to Plaintiffs and to deny Insurer's motion for partial summary judgment on the issue of whether the twelve-month limitation applies to lost business income. Plaintiffs' recovery of lost business income was not limited to twelve months.

### B. The Alleged Six-Month Limitation

Next, Insurer argues that the trial court erred by failing to limit Plaintiffs' recovery of lost business income to a six-month period, which Insurer argues was required by the appraisal award. The trial court awarded Plaintiffs a judgment in the amount of $1,060,297.66 (less credits already paid for twelve months of benefits), effectively awarding Plaintiffs thirty-five months of lost business income from June 2005 to April 2008. Insurer argues that Plaintiffs are only entitled to recover $173,910.60, representing six months of lost business income.

The relevant findings by the appraisal panel were as follows:

**Actual business income loss incurred:**
    $1,060,297.66 (from June, 2005 to April, 2008)
**The reasonable time frame within which the repairs to the building should have been completed:**

    6 months from date construction begins
The attached worksheet or explanation page broke down the $1,060,297.66 figure into $45,819 in extra expense, plus $1,014,478.66 in lost business income, with the notation, "from June 05 to April 08 – additional 6 months to complete."

The trial court granted Plaintiffs' motion for partial summary judgment with regard to this issue, finding that: (1) the policy provided that a decision by the appraisal panel as to the amount of lost business income would be binding; (2) the appraisal panel necessarily determined the Period of Restoration in determining the amount of lost business income; (3) the appraisal panel found that the "Period of Restoration" began on the date of loss, June 13, 2005, and ended six months after the Appraisal Award was signed on October 16, 2007; and (4) the appraisal award established the actual business income loss and extra expense incurred was $1,060,297.66.

Insurer's arguments on appeal regarding this issue are contradictory. First, Insurer argues, basically, that the appraisal award could not and did not establish the applicable "period of restoration" as defined by the policy. According to Insurer, "the Appraisal Award's simple statement of the actual business income loss does not negate the terms of the Policy which limit the coverage of business income loss to only that incurred during the 'period of restoration.'" Insurer claims that the appraisal panel was only authorized to value the damages incurred by Plaintiffs, or, in other words, to calculate the total damages incurred by Plaintiffs through the date of the appraisal award. Insurer points out that Umpire Smith testified during her deposition that she read and interpreted the insurance policy and determined the "period of restoration" in the context of determining the "actual business income loss" incurred by Plaintiffs. Insurer claims that determining the "period of restoration" constituted an issue of coverage and liability, and therefore, the appraisal panel's determination of this issue "went beyond the scope of the Appraisal and beyond Umpire Smith's authority." Insurer cites *Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 152 (Tenn. Ct. App. 2001), where the Court stated:

> An appraiser's authority is limited to the authority granted in the insurance policy or granted by some other express agreement of the parties. The appraisal clause in Ms. Batts's homeowners policy is limited to determining the

"amount of the loss"—the monetary value of the property damage. It does not vest the appraisers with the authority to decide questions of coverage and liability, and there is no evidence that Merrimack and Ms. Batts agreed independently to give this authority to Messrs. Keys, Horton, and Ward. Without evidence of some agreement by the parties, there is no legal or factual basis for concluding that the appraisers were empowered to decide coverage questions.

Based upon the Court's statement in *Merrimack*, Insurer argues that the appraisal panel in this case had no authority to determine the period of restoration, as it was a coverage issue that was not subject to the appraisal process. According to Insurer, "Umpire Smith's statements, opinions, and interpretations of the policy provisions are irrelevant and should not be considered by this Court as they go beyond the scope of her authority as an umpire. It is not for the Umpire to decide what constitutes the 'Period of Restoration.'"

The second half of Insurer's argument regarding this issue directly contradicts the first. After arguing that the appraisal panel exceeded its authority in determining the period of restoration, and that we should ignore its finding as to the applicable period of restoration, Insurer goes on to argue that the trial court erred "by failing to properly limit the Business Income and Extra Expense Endorsement loss coverage to the six month period of restoration *established by the appraisal*." (Emphasis added). Insurer relies upon the section of the appraisal award establishing the "reasonable time frame within which the repairs to the building should have been completed" as "6 months from date construction begins." Insurer argues that the period of restoration "ended six months after the date of loss as the Appraisal Award confirms the property could have been repaired within six months." Insurer claims that "the 'period of restoration' . . . has been established at six (6) months by the Appraisal Award."

We reject both of these arguments by Insurer. First of all, we find that the appraisal panel did not exceed its authority in determining the applicable period of restoration. As noted in *Merrimack*, the appraisal panel's authority was "limited to the authority granted in the insurance policy or granted by some other express agreement of the parties." Here, the insurance policy provided that if the Insurer and the insured disagreed as to "the amount of loss," then either party could demand an appraisal of the loss, and a decision by the panel as to the amount of loss would be binding. The insurance policy provided that Insurer would pay for "the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration,'" with the "period of restoration" beginning on the date of loss and ending "on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality." After Insurer and Plaintiffs were unable to agree as to the amount of lost business income

owed by Insurer, Insurer demanded an appraisal, and Insurer specifically submitted the following issues to the appraisal panel: "the actual business income loss incurred" and "the reasonable time frame within which the repairs to the building should have been completed." Substantial construction had not begun at the time of the appraisal award. The appraisal panel concluded that repairs could be completed "6 months from date construction begins." It therefore calculated Plaintiffs' lost business income from the date of the loss until six months after the October 2007 appraisal award, thereby establishing that the period of restoration would end in April 2008. These determinations by the appraisal panel did not exceed the scope of its authority. Pursuant to the insurance policy, the panel was authorized to make a binding determination as to "the amount of loss," and the parties expressly agreed to submit to the appraisal panel the issue of the "the actual business income loss incurred." Moreover, the parties expressly agreed that the appraisal panel would decide, not only the value of the loss, but "the reasonable time frame within which the repairs to the building should have been completed." These determinations necessarily included a determination of the applicable period of restoration.

Essentially, Insurer is arguing that the appraisal panel was not authorized to determine the period of restoration in calculating the "actual business income loss incurred," while at the same time arguing that the panel's determination as to the "reasonable time frame" for repairs should be interpreted as a conclusive determination of the period of restoration. However, Insurer places too much emphasis upon the six-month period and ignores the fact that the appraisal panel determined that the repairs should have been completed by six months from the date of the appraisal award, or April 2008. Insurer cannot cherry-pick from isolated portions of the appraisal award in order to suggest that the appraisal panel made a finding that contradicts other portions of the award. This is especially true when Umpire Smith and Appraiser Dickinson clearly testified that the appraisal award established the period of restoration as ending in April 2008, not six months from the date of the June 2005 fire loss. Simply put, the appraisal award's finding that the reasonable time frame for repairs was six months from the date construction begins did not equate to a finding that the period of restoration was six months from the date of the fire. The appraisal panel found that, considering the circumstances existing at the time of the appraisal award in October 2007, a reasonable time frame for the completion of repairs was six months, assuming that substantial construction could begin immediately. The appraisal panel apparently made the determination that it would take six months to complete repairs considering the circumstances that had occurred up to that point, such as cleaning of the fire damage and stabilization of the building. The appraisal panel clearly did not find that substantial construction could have begun on the date of the fire, or that the building could have been completely repaired within six months of the fire. It is undisputed that after the fire, Insurer placed restrictions on Plaintiffs' ability to alter the state of the building for a period of time due to the possibility of a subrogation claim regarding the cause of the fire. It is also obvious

from these proceedings that Insurer did not pay the entire amount it owed for the property damage loss until after the appraisal award, some two years after the fire. The appraisal panel clearly took into account the circumstances as they existed at the time of their decision when finding that the period of restoration should end in April 2008. On appeal, Insurer points to various facts about the timeline of events after the fire in support of its position as to when the repairs should have reasonably been completed. These facts are irrelevant at this stage of the proceedings, however, as the parties expressly agreed that the appraisal panel would decide "the reasonable time frame within which the repairs to the building should have been completed." The appraisal panel found that repairs should have been completed by April 2008, and that decision was binding.

In sum, the appraisal panel made a binding determination that the reasonable time frame within which the repairs to the building should have been completed was by April 2008, and that the actual loss of business income incurred by Plaintiffs during that period was $1,060,297.66. There is no genuine issue of material fact as to the appraisal panel's findings or the binding nature of its decision. Accordingly, we find that the trial court properly granted partial summary judgment to Plaintiffs on the issue of whether the recovery of lost business income was limited to a six-month period pursuant to the appraisal award. Furthermore, the trial court properly denied Insurer's motion for summary judgment and appropriately dismissed Insurer's counterclaim relative to this issue.[5] Plaintiffs' recovery of lost business income was not limited to six months.

---

[5] In their appellee's brief, Plaintiffs pointed out that Insurer had not raised any issue on appeal regarding the propriety of the trial court's award of prejudgment interest, and therefore, Plaintiffs considered the issue waived. In its reply brief, Insurer argued, for the first time, that the trial court erred in granting prejudgment interest. Insurer argued that its challenge to the trial court's grant of summary judgment "automatically includes an argument that the pre-judgment interest awarded to Plaintiffs was improper[.]" However, Insurer's initial appellate brief was 51 pages in length, and it only mentioned the term prejudgment interest once, in its statement of facts, where it noted that interest was awarded. We agree with Plaintiffs and hold that Insurer waived any argument regarding the propriety of awarding prejudgment interest by failing to raise it as an issue in its initial brief. "A reply brief is a response to the arguments of the appellee. It is not a vehicle for raising new issues." *Owens v. Owens*, 241 S.W.3d 478, 499 (Tenn. Ct. App. 2007) (citing Tenn. R. App. P. 27(c); *Denver Area Meat Cutters & Employers Pension Plan v. Clayton*, 209 S.W.3d 584, 594 (Tenn. Ct. App. 2006)). "A reply brief is limited in scope to a rebuttal of the argument advanced in the appellee's brief." *Clayton*, 209 S.W.3d at 594. It would be fundamentally unfair to permit an appellant to advance new arguments in the reply brief, as the appellee may not respond to a reply brief. *Id.* This concern is especially true here, where Plaintiffs justifiably concluded that Insurer was not advancing a particular argument on appeal and simply noted the reason why it had not presented an argument regarding that issue.

### C.    The Motion to Quash

Finally, Insurer argues that the trial court erred in granting Umpire Smith's motion to quash the subpoena, thereby precluding Insurer from obtaining Umpire Smith's entire file related to this case.  "The decision of the trial court in discovery matters will not be reversed on appeal unless a clear abuse of discretion is demonstrated." *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992) (citing *Paine v. Ramsey*, 591 S.W.2d 434, 436 (Tenn. 1979)).  "An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous assessment of the evidence." *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).  "In determining whether the trial court abused its discretion, an appellate court 'should presume that the [trial court's] decision is correct and should review the evidence in the light most favorable to the decision.'" *Mayfield v. Mayfield*, 395 S.W.3d 108, 115 (Tenn. 2012) (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-106 (Tenn. 2011)).  Under this standard, we will uphold the trial court's determination, irrespective of our inclination to decide the issue differently, so long as the trial court's decision is within the range of acceptable alternatives. *Tait v. Tait*, 207 S.W.3d 270, 275 (Tenn. Ct. App. 2006).

Tennessee Rule of Civil Procedure 45.07 allows a trial court to quash a subpoena if it is unreasonable and oppressive.[6] *Pippin v. Pippin*, 277 S.W.3d 398, 403 (Tenn. Ct. App. 2008).  Here, the trial court granted Umpire Smith's motion to quash on the basis that "the additional discovery sought by [Insurer], in the form of all notes and records of the Umpire as demanded in the Subpoena . . . constitutes an oppressive request under the facts and circumstances presented, is unduly burdensome, and is not reasonably calculated to lead to the discovery of additional admissible evidence."  Considering the fact that Umpire Smith had already provided deposition testimony and an affidavit to clarify the alleged ambiguity in the appraisal award, we cannot say that the trial court abused its discretion in finding that it would be unreasonable and oppressive to require Umpire Smith to produce her entire file, including all notes, records, and correspondence regarding the case.  According to the appraisal provision of the insurance policy, the parties agreed that a decision by any two members of the appraisal panel would be "binding."  The trial court permitted limited discovery regarding the alleged ambiguity in the award, and we find no error in its

---

[6] Rule 45.07 was amended effective July 1, 2013.  According to the 2013 advisory commission comment, the amendment "eliminates the necessity for a non-party [witness] to file a motion to quash or modify a deposition subpoena for testimony or subpoena for production of documentary evidence," and it "adopts the procedure under Fed. R. Civ. P. 45(c)(2)(B), permitting the subpoenaed non-party to serve a written objection on the party or attorney designated in the deposition subpoena. . . . The burden is shifted to the party issuing the subpoena to file a motion to compel."  The trial court granted the motion to quash in this case in 2011, so the 2013 amendment is not applicable for purposes of our analysis.

discretionary decision to prevent further discovery of the appraisal umpire's entire file containing her notes, records, and correspondence.

## V.  CONCLUSION

For the aforementioned reasons, we affirm the judgment of the circuit court and remand for further proceedings as may be necessary.  Costs of this appeal are taxed to the appellant, Auto-Owners Mutual Insurance Company, and its surety, for which execution may issue if necessary.

ALAN E. HIGHERS, P.J., W.S.